IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CRAIG ALAN CASTANEDA,

   Defendant.

CRIMINAL CASE NO.
1:15-CR-213-ELR-LTW

---

### MAGISTRATE JUDGE'S ORDER AND  FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

Pending before this Court are Defendant Craig Alan Castaneda's Motion for Return of Seized Property (Doc. 18), Motion to Suppress Evidence Obtained Through Warrant Search (Doc. 30), Second Motion to Suppress Evidence Obtained Through Warrant Search (Doc. 41), Motion to Dismiss Indictment (Doc. 73), and Amended Motion to Dismiss Indictment (Doc. 76).  For the reasons outlined below, Defendant's Motions to Dismiss the Indictment and Motions to Suppress should be **DENIED**. (Docs. 30, 41, 73, 76).  Defendant's Motion for Return of Seized Property is **DEEMED MOOT**.  (Doc. 18).

### MOTION TO DISMISS INDICTMENT

On June 2, 2015,  a federal grand jury sitting in the Northern District of Georgia returned a two-count Indictment against Defendant Craig Alan Castaneda ("Defendant").  In Count I, Defendant is charged with using a facility and means of

interstate commerce (a cellular telephone and a computer connected to the internet) to attempt to entice an individual who is under the age of eighteen to engage in sexual activity in violation of 18 U.S.C. § 2422(b).  (Doc. 12).  In Count II, Defendant is charged with knowingly crossing a state line with intent to engage in a sexual act with a person who had not attained the age of twelve years old in violation of 18 U.S.C. § 2241(c).  (Id.).

Defendant argues in his Motion to Dismiss the Indictment (Doc. 73), his Amended Motion (Doc. 76), and his Reply Brief (Doc. 81) that the Indictment against him should be dismissed because the Government engaged in unprecedented misconduct when law enforcement officers posed as the mother of a minor daughter and posted an advertisement on Craigslist for "taboo mom looking for like minded teacher," indicated a username Kandibaby, and directed Defendant to a MeetMe.com address which would contain pictures of the purported mother of the minor daughter.  Defendant asserts that with this information, he did a "brief, cursory internet search" and "was confronted with videos of Cox engaging in sexual acts with a young boy and with a teenage girl." Defendant states that based on his search, he feared the children in the video and the child of whom the agent was speaking was in imminent danger of being sexually abused.  Additionally, Defendant contends that the Government knew or should have known that it was providing access to contraband, but did nothing to address the availability of it.  Defendant contends that as a result, the Government re-victimized the children in the video and its conduct was so shocking and indifferent to the child victims

2

that due process demands dismissal of the Indictment.

## I.   **FACTUAL BACKGROUND**

Special Agent Kevin Orkin with the Federal Bureau of Investigation ("FBI") served as the case agent and an undercover investigator with respect to Defendant's case. (Tr. 6).  Special Agent Orkin, posing as "Kandi," the mother of a minor female child, began the case by posting an advertisement on Craigslist seeking someone to teach a daughter about sex. (Tr. 6-8, 39).  The advertising posts are written using certain key words to attract individuals who are into child pornography or the sexual abuse of children.  (Tr. 39-40).  According to Special Agent Orkin, Defendant responded to the Craigslist advertisement via email.  (Tr. 6-7).  After Defendant responded, Defendant and Special Agent Orkin moved to a chat program called Kik to continue their discussions over a period of one to two months.   (Tr. 7).   The bulk of the communications between the two was in reference to Defendant coming to Atlanta for the purpose of engaging in sex with the minor daughter.  (Tr. 7).

At some point, Defendant asked Special Agent Orkin for a picture of Kandi.  (Tr. 8).  Special Agent Orkin responded by providing Defendant with a link to the online profile for Katrina Cox, a specific user on a website called MeetMe.com.  (Tr. 9-10).  The link information Special Agent Orkin provided to Defendant was a publicly available link and anyone could visit it by just having the link. (Tr. 15).  Special Agent Orkin does not recall doing any extensive investigation of Cox's MeetMe account prior to sending Defendant the link.  (Tr. 18).  Special Agent Orkin testified, however, that

AO 72A
(Rev.8/82)

he did review the page that came up when one clicked the link for the account, and states that there was no child pornography on the publicly-available page.  (Tr. 36).

Katrina Cox was prosecuted and pled guilty in the Northern District of Georgia to production of child pornography.  (Tr. 11).  Cox was assisting FBI in the investigation and consented for agents to use her online identity in a Facebook account, a gmail email account, and a Kik Messenger account.  (Tr. 12, 14).  Cox provided investigators with the passwords for each of these three accounts.  (Tr. 15).  All three of the accounts include the digits b3774 and for two out of three, b3774mama.  (Tr. 14). The FBI never obtained access from Cox or otherwise for her MeetMe account and she never provided the FBI login information for the account.  (Tr. 15, 35-36).

According to Special Agent Orkin, use of the online identity is a standard investigation tactic because individuals often engaged in the dissemination of child pornography are involved with multiple people and it gives the FBI the opportunity to find out to whom the individuals are talking and to possibly identify additional subjects. (Tr. 13).  Special Agent Orkin testified that the tactic is an approved technique and that it is more effective for the FBI to assume a known identity with whom potential subjects have already been communicating.  (Tr. 16-17).

During the course of the investigation, Special Agent Orkin also worked with Laurie Nicholson, who is employed by the City of Alpharetta.  Nicholson is loaned to the FBI as a task force officer on the MATCH task force, which is the Metro Atlanta Child Exploitation Task Force.  (Tr. 29-30, 41).  Task Force Officer Nicholson's ("TFO

4

Nicholson") role in the investigation was to pose as "Kandi," the mother of the minor child, during two telephone calls with Defendant. (Tr. 30, 42-43, 49). TFO Nicholson's goal in the investigation was to provide a female voice so that suspects would believe that an account was not just an account. (Tr. 43). TFO Nicholson testified that she discussed with Defendant a user ID called b3774mama during the first phone call with him and that she mentioned the full gmail account name to him. (Tr. 52-53).

Defendant asserts in his brief that when Nicholson sent him a link to a profile on MeetMe.com with the username b3774mama, he googled the username b3774mama and found three results, the last of which was a listing of email accounts and passwords, which included an email address, mzz.katrina@gmail.com, with the password b3774mama. (Doc. 81, at 4). Defendant asserts that he simply logged into this account and found highly disturbing materials. (Id.). Defendant states that after exploring such materials, he concluded that Nicholson was not Kandi as she claimed to be, that at least one child had actually been molested, and the molestation had been filmed. (Doc. 81, at 5). Defendant maintains that based on this information, he was drawn into further conversation with "Kandi" and his aim changed from engaging in fantasy to worrying intensely about the safety of the child he had seen abused. (Doc. 81, at 5).

TFO Nicholson testified that she never came across or heard about the mzz.katrina email address until the day of the hearing. (Tr. 48, 51). TFO Nicholson states that she never suggested to Defendant that he should hack into Kandi's email or social media accounts, and never provided him with the passwords to any of Kandi's

5

purported email or social media accounts. (Tr. 51-52). TFO Nicholson also never provided Defendant with permission to log into any of Kandi's email or social media accounts. (Tr. 52).

Likewise, Special Agent Orkin testified that he never mentioned the mzz.katrina gmail address to Defendant when he played the role as Kandi. (Tr. 36-37). Special Agent Orkin did not know about the mzz.katrina gmail address when he was corresponding with Defendant. (Tr. 37). The consent form the FBI obtained from Cox does not include the email address mzz.katrina@gmail.com as an account the FBI was permitted to access and use. (Tr. 34). Special Agent Orkin also testified that he never mentioned or suggested that Defendant should attempt to hack the account, and never gave Defendant permission to access the address. (Tr. 36-37). Special Agent Orkin further testified that he never gave Defendant permission to log into any account controlled by him while posing as Kandi. (Tr. 37).

Additionally, Special Agent Orkin states that while it is possible that he might have performed a Google search with regard to the b3774mama during the course of the investigation, there is no standard procedure for what must be done, and he does not have any specific recollection of searching for b3774mama on Google. (Tr. 18-19). Special Agent Orkin learned during the progress of the criminal prosecution in this Court that Defendant accessed pornography on one of Cox's accounts and then Special Agent Orkin obtained a search warrant for the account. (Tr. 28). Based on the results from the search warrant, Special Agent Orkin confirmed that there was child

6

pornography on the account.  (Tr. 28).  Special Agent Orkin learned that Cox was engaged in the production of child pornography involving her young son.  (Tr. 33).  Special Agent Orkin also learned that Cox's illicit videos had been accessible.  (Tr. 33).

FBI Special Agent Scott Warren assumed Special Agent Orkin's responsibilities as case agent in 2016.  (Tr. 55).  Special Agent Warren testified that he did not learn of the issues raised by Defendant about the accessibility of child pornography until November 2016, when he was briefed the Assistant United States Attorney involved in the case.  (Tr. 56-57).  When asked whether the offending materials were still on line, Special Agent Warren testified that he did not believe so, but that he had no way to personally confirm whether they were.  (Tr. 58).

## II.   **LEGAL ANALYSIS**

Defendant argues in his Motion to Dismiss the Indictment (Doc. 73), his Amended Motion (Doc. 76), and his Reply Brief (Doc. 81), that the Indictment against him should be dismissed because the Government engaged in unprecedented misconduct when law enforcement officers posed as the mother of a minor daughter and posted an advertisement on Craigslist for "taboo mom looking for like minded teacher," indicated a username Kandibaby, and provided a MeetMe.com address which would contain pictures of the purported mother of the minor daughter.  Defendant asserts that with this information, he did a "brief, cursory internet search" and "was confronted with videos of Cox engaging in sexual acts with a young boy and with a teenage girl."  Defendant states that based on his search, he feared the children in the video and the child of whom

7

the agent was speaking was in imminent danger of being sexually abused.  Additionally, Defendant contends that the Government knew or should have known that it was providing access to Cox's illicit videos, but did nothing to address the availability of it. Defendant contends that as a result, the Government re-victimized the children and its conduct was so shocking and indifferent to the child victims that due process demands dismissal of the Indictment.

In the Government's post-hearing brief, the Government responds that Defendant's Motion is untimely and also fails on the merits because Defendant cannot show outrageous government conduct where he was only exposed to child pornography because he hacked another person's email account independent of any government suggestion or guidance.  Defendant did not file a post-hearing brief.

Defendant invokes the outrageous government conduct defense.  The defense "focuses on whether the tactics employed by law enforcement officials to obtain a conviction for conduct beyond the defendant's predisposition violate the Fifth Amendment's due process guarantee." United States v. Dixon, 626 F. App'x 959, 962-63 (11th Cir. 2015).  "To constitute a constitutional violation, the law enforcement technique must be so outrageous that it is fundamentally unfair and shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." United States v. Ofshe, 817 F.2d 1508, 1516 (11th Cir. 1987); see also United States v. Arango, 853 F.2d 818, 828 (11th Cir. 1988) (finding that "[o]utrageous government conduct occurs when law enforcement obtains a conviction for conduct

8

beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees." United States v. Jayyousi, 657 F.3d 1085, 1111-12 (11th Cir. 2011). The defense may be invoked only in the rarest circumstances. Ofshe, 817 F.2d at 1516. Indeed, the Eleventh Circuit has never found that the government's conduct rose to the level of outrageousness required for the defense to succeed. Dixon, 626 F. App'x at 963 (citing Jayyousi, 657 F.3d at 1111). When analyzing whether the conduct is sufficiently outrageous, "the totality of the circumstances must be considered with no single factor controlling." Ofshe, 817 F.2d at 1516.

"The Supreme Court has also made it abundantly clear that the limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the defendant." United States v. Farias, 836 F.3d 1315, 1325 (11th Cir. 2016) (citing Hampton v. United States, 425 U.S. 484, 490 (1976)). Thus, a defendant's allegations that the Government's conduct harmed individuals other than the defendant fail to establish a violation of the defendant's due process rights. Farias, 836 F.3d at 1325-26 (rejecting defendant's argument that the government's action violated his due process rights where defendant argued that government sting operation benefitted tobacco companies and harmed public health by making cigarettes available at a below-market price).

Based on all the facts and circumstances as alleged in this case, Defendant fails to demonstrate that the Government's conduct was so outrageous that he was denied due process. First, there is nothing about the Government's actions that was unfair to

this Defendant.  While law enforcement officers did provide Defendant with Cox's public profile information for her Kik messenger account which had the digits b3774 in the username, and Cox's gmail account, b3774mama@gmail.com, there is no indication here that law enforcement officers posing as Kandi encouraged Defendant to google the username b3774mama in order to find additional accounts.  (Tr. 14, 36-37, 48-54).  Basically, Defendant found the mzz.katrina@gmail.com which exposed him to "highly disturbing material" entirely on his own initiative.  (Tr. 14, 36-37, 48-54).  Indeed, Special Agent Orkin credibly testified that he never mentioned the mzz.katrina gmail address account to Defendant because he did not know about the address when he was corresponding with Defendant.  (Tr. 37).  Likewise, TFO Nicholson credibly testified that she never heard about the mzz.katrina email address until the day of the hearing. (Tr. 48, 51).  Both Special Agent Orkin and TFO Nicholson credibly testified that they never gave Defendant permission to hack the email address or log into any of Cox's email or social media accounts while they were posing as Kandi.  (Tr. 36-37, 48-52).  Additionally, while the law enforcement officers posing as Kandi initially provided Defendant with a public link for Cox's MeetMe account, there was no child pornography on the publicly available page.  (Tr. 9-10, 15, 36).

Furthermore, to the extent that the law enforcement officers' actions can be said to have exposed the victims of child pornography in some way to further harm, the law enforcement conduct here is not sufficiently outrageous to establish the defense.  First, harm to child pornography victims does not assist Defendant's cause because the harm

10

to the child pornography victims does not result in any unfairness to Defendant or otherwise harm Defendant's due process rights. Farias, 836 F.3d at 1325-26 (explaining that the defendant's allegations that sting operation benefitted tobacco companies and harmed public health by making cigarettes available at a below-market price was irrelevant and could not establish a violation of the defendant's due process rights) (citing Hampton v. United States, 425 U.S. 484, 490 (1976)); United States v. Hall, Nos. 1:16-CR-147, 1:17-CR-60, 2017 WL 6757645, at *9 (W.D.N.C. Dec. 7, 2017) (rejecting the argument that harm to child pornography victims could assist defendant in raising a claim of outrageous government conduct); United States v. Davis, 57 F. Supp. 3d 363, 368-69 (S.D. N.Y. 2014) (rejecting outrageous government conduct defense relying upon the potential risk of harm to third parties). Second, to the extent that law enforcement agents unintentionally caused additional exposure to child pornography victims here is not enough to establish the defense. Courts have consistently found investigative tactics which have intentionally put child pornography in the hands of suspects and have far more potential for harm to child pornography victims insufficiently outrageous to satisfy the outrageous conduct defense. For instance, in United States v. Mitchell, 915 F.2d 521 (9th Cir. 1990), the Ninth Circuit evaluated government agents' conduct in targeting individuals suspected of purchasing pornography from commercial distributors, gathering the names of individuals who responded to advertisements placed by the government in sexually oriented magazines, and collecting the names of friends, associates, and correspondents of individuals who

11

had been arrested for violating pornography laws.  Id. at 522-24.  The government sent targeted individuals applications or questionnaires in connection with solicitation for possible membership with various undercover organizations established by the government, such as "Love Land," "Crusaders for Sexual Freedom," and the "American Hedonist Society."  Id. at 524.  The questionnaires were also designed to ascertain potential interest in child pornography and individuals believed to have interest in child pornography/pedophilia were solicited again with a catalog and order form prepared by the government.  Id. at 525-26.  In that case, the defendant purchased a child pornography magazine he found in the catalog and received the magazine.  Id. at 525-26.  The Ninth Circuit concluded that the government's actions did not violate the defendant's due process rights or notions of fundamental fairness because the defendant was not coerced or threatened into buying child pornography, the defendant voluntarily responded to the solicitation without government prodding, and the defendant had previously ordered an illicit child pornography magazine.  Id.  Other circuits have reached similar conclusions.  See  United States v. Musslyn, 865 F.2d 945, 946-47 (8th Cir. 1989); United States v. Driscoll, 852 F.2d 84, 85-86 (3d Cir. 1988) (the government's solicitation of child pornography to defendant was not outrageous enough to bar defendant's conviction for receipt of child pornography through the mails where the government sent the defendant child pornography magazine, because the nature of the production, distribution, and sale of child pornography itself justifies such uncover operations); United States v. Cruz-Fajardo, No. 1:16-CR-0014-TCB, 2017 WL 3634278,

at *3-4 (N.D. Ga. Aug. 23, 2017); United States v. Pawlak, 237 F. Supp. 3d 460, 471 (N.D. Tex. 2017) (concluding that government's continued operation of the website hosting child pornography in order to locate child pornography offenders did not violate due process because the government did not create the website, did not alter the website's functionality, did not add child pornography, did not actively solicit new users, but rather simply maintained existing structure); United States v. Kim, No. 16-CR-191 (PKC), 2017 WL 394498, at *3-4 (E.D.N.Y. Jan. 27, 2017) (explaining that government's continued operation of website hosting child pornography materials was not sufficiently outrageous to offend due process principles because defendant did not show that FBI's operation of target website would have resulted in the commission of child pornography crimes which would not have otherwise been committed or that the government's conduct caused defendant to commit crimes he would not have committed); United States v. Allain, 213 F. Supp. 3d 236, 253 (D. Mass. 2016) (concluding that while investigation of child pornography had disturbing consequences because the pornography distributed by the government might live on and be redistributed in the internet for indefinite amount of time, investigation was not outrageous because the difficulty of identifying individuals accessing child pornography online forces investigators to make difficult choices about how to investigate and prosecute the crime).

Likewise, the fact that law enforcement officers posed as the mother of a minor child and solicited individuals on Craigslist to educate her child about sexual contact

13

does not transform the Government's conduct into outrageous conduct. Here, there is no evidence that any Government agent coerced Defendant to allegedly answer the advertisement, to converse with agents posing as the mother of a minor child, or to arrange to have a sexual encounter with a child. Furthermore, the undercover operation did not cause any direct harm to a minor child. Kandi's child was a fiction and thus, no actual child ever came into contact with Defendant. Undercover operations of this sort have been repeatedly found to be necessary in order to protect children from serious crimes which can have devastating affects on children and society and have been found not to be outrageous government conduct. United States v. Vickers, 683 F. App'x 393, 397 (6th Cir. 2017); United States v. Garcia, 411 F.3d 1173 (10th Cir. 2005) (government's conduct was not sufficiently outrageous where agent posed in chat room as a mother with young daughters and defendant himself suggested that the "mother" meet with him so that he could engage in sexual activities with the "daughters"); United States v. Mikoloyck, No. 09-00036-01-CR-W-GAF, 2009 WL 4798900, at *6-7 (W.D. Mo. Dec. 7, 2009). Because Defendant cannot establish the outrageous government conduct defense, Defendant's Motions to Dismiss the Indictment should be **DENIED**. (Docs. 73, 76).

## DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

Defendant initially argued in his Motion to Suppress Evidence Obtained Through Warrant Search (Doc. 30) that evidence the Government obtained from executing a warrant should be suppressed because it was not based on probable cause. In support,

AO 72A
(Rev.8/82)

Defendant argued the search of his computers was not supported by probable cause. Specifically, Defendant contends probable cause is lacking because Yolanda Cooley, a friend of Defendant, turned over five computers allegedly owned by Defendant to the FBI even though Casey Cousins, another friend of Defendant, indicated that he had discovered a video purportedly containing child pornography on only one out of the five computers. Defendant also contends that the magistrate judge, in issuing the warrant, unduly relied upon expert testimony set forth in the affidavit supporting the application for a search warrant that collectors of child pornography will maintain their collections on multiple devices. Defendant asserts such expert testimony was undercut in his case because there was an "absence of any pornography on the devices seized during his arrest." Defendant further contends that there is insufficient indicia of Cousins' reliability to support a finding of probable cause.

Defendant subsequently filed his Second Motion to Suppress Evidence Obtained Through Warrant Search. (Doc. 41). Defendant indicated that this Second Motion to Suppress superceded his previous Motion to Suppress. Accordingly, Defendant's initial Motion to Suppress Evidence Obtained Through Warrant Search (Doc. 30) should be **DEEMED MOOT**.

In Defendant's Second Motion to Suppress Evidence Obtained Through Warrant Search, Defendant argues Cooley and Cousins could not provide consent for the FBI to search his computers because he instructed Cousins during a recorded phone call not to surrender the computers without first speaking to Defendant's counsel. (Doc. 41, at 3).

15

Additionally, Defendant again argues the affidavit supporting the search warrant application did not provide probable cause in support of the warrant. In support, Defendant contends that the affidavit set forth no basis for believing that any computer other than the one on which Cousins allegedly viewed pornography would contain pornography and there was no indicia of Cousin's reliability. Defendant also contends that the magistrate judge issuing the warrant unduly relied upon expert testimony set forth in the affidavit that collectors of child pornography will maintain their collections on multiple devices. Defendant maintains that such expert testimony was undercut in his case because there was no pornography on the devices seized during his arrest.

The Court held an evidentiary hearing (Doc. 58) on February 23, 2016. During the evidentiary hearing, the Court heard testimony from Cooley, Cousins, and Special Agent Brian Hamilton, the agent to whom Cooley and Cousins gave Defendant's computers. Cousins testified that he was residing in Defendant's residence and handled various errands for Defendant via computer while Defendant remained in jail. (Tr. 47, 50-51). Defendant had given the password for his computer to Cousins. (Tr. 47). Cousins credibly testified that he found a child pornography video on Defendant's computer while he was utilizing it to find a television show to watch. (Tr. 40-41, 53-54). Cousins immediately called Cooley and told her what he had found. (Tr. 41). After Cousins found the materials on Defendant's computer, Cousins became concerned that he could be blamed for the materials on the computer and could be vulnerable to prosecution. (Tr. 35).

16

Cooley, who was also taking care of Defendant's residence and affairs while Defendant was in jail and who lived in Defendant's residence from time to time, credibly testified that Cousins told her he found child pornography on Defendant's computer in the living room of his residence.  (Tr. 8, 22, 26-27, 31).  Cousins and Cooley decided to turn over Defendant's computer to the FBI because they believed that they should not have it in their possession and they did not want to put themselves at risk.  (Tr. 10, 12-13, 15, 17, 20, 23, 28-31, 35, 54-55).  Within two days, Cooley contacted the FBI agents and told them that she had material she needed to turn over. (Tr. 12, 29).

Cousins testified that he recalls telling Defendant that agents were on the way, but did not mention the computers.  (Tr. 42).  Defendant instructed Cousins to be cooperative, but then ended the call by saying he would rather Cousins talk to his attorney.  (Tr. 42-43).  According to Cousins, he and Cooley attempted to reach Defendant's attorney, but never received a return call.  (Tr. 43).

Cooley took the initiative and gave three or four computers from Defendant's residence to Special Agent Hamilton and his colleague in a Starbucks parking lot.  (Tr. 13-14, 30).  Subsequently, Cousins discovered that one computer was inadvertently left in Cooley's car, and turned it over to the FBI.  (Tr. 40, 44, 67).  Cousins credibly testified that the FBI agents never asked him to search any of Defendant's computers or any other task on behalf of the FBI. (Tr. 49). Special Agent Hamilton similarly credibly testified that he never asked Cooley to search any of Defendant's electronic devices and

17

never asked for Cooley's assistance in the investigation. (Tr. 61). Likewise, Cooley credibly testified that the FBI did not ask her to conduct searches for the FBI, did not ask her to search through Defendant's home, and did not ask her to do anything to further the FBI's investigation. (Tr. 25-30).

After the Suppression Hearing was concluded, Defendant was given an opportunity to file a post-hearing brief and to perfect his Motion to Suppress. Defendant was initially given until April 22, 2016, to file his post-hearing brief. (Tr. 73; Doc. 58). Defendant requested and obtained an extension of time through and including June 20, 2016, to file his post hearing brief and through September 26, 2016, to file a Reply. (Doc. 64). Defendant filed his post-hearing brief on June 21, 2016. (Doc. 65). Although Defendant filed a post-hearing brief, he did not perfect, delineate the arguments for, or otherwise expound upon the basis for his Motions to Suppress following the hearing. Additionally, though Defendant's Motion to Suppress hinged in part on whether the affidavit supporting the search warrant application was supported by probable cause, Defendant never provided a copy of the search warrant application. Instead, Defendant's post-hearing brief advanced an entirely new theory for suppression of the evidence seized from Defendant's computer. For the first time, Defendant argued that the computer was seized on June 25, 2015, but a warrant application was not sworn and filed until August 3, 2015, despite the Court's directive that the warrant be executed by August 17, 2015. (Doc. 65, at 3-4). Defendant argues, based on his information and belief, that the searches were not completed until February 2016. (Doc. 65, at 4). Defendant did not file a Reply in support

18

of his Motion to Suppress.

On September 19, 2017, this Court held a status conference after Defendant obtained new counsel. (Doc. 96). During the status conference, Defendant's new counsel was asked if he would need additional time to file motions. (Doc. 96). Defendant's counsel advised the Court at that time that he did not intend to file any additional motions and that a Report and Recommendation could be issued. (Doc. 96).

Because Defendant never perfected his Motion to Suppress as to any of his original arguments for suppression raised in his opening brief, they have been abandoned. See United States v. Rosso, No. 3:14-CR-00014-TCB, 2015 WL 7115860, at *28 n.26 (N.D. Ga. Nov. 12, 2015); United States v. Cadet, No. 1:11-CR-00522-WBH, 2013 WL 504892, at *9 (N.D. Ga. Jan. 16, 2013), R. & R. adopted, No. 1:11-CR-113-WBH-2, 2013 WL 504815 (N.D. Ga. Feb. 8, 2013) (citing United States v. Chappell, No. 1:10-CR-513-WSD-ECS, 2011 WL 5353016, at *5 (N.D. Ga. M ay 25, 2011) (deeming argument defendant raised in pre-hearing motion, but did not expound upon in post-hearing briefs, to be waived and abandoned); United States v. Shorr, No. 1:07-CR-182-1-TWT, 2008 WL 655994, at *1 (N.D. Ga. Mar. 10, 2008) (same). Accordingly, Defendant's Motion to Suppress should be **DENIED**. (Doc. 41).

Even if the Court were to consider Defendant's unperfected suppression motion, it would likely fail on the merits. Despite Defendant's focus on the idea that Cooley used his computer without his permission and disregarded his instruction to consult with Defendant's counsel before cooperating with the FBI, it makes no difference whether

19

Cooley followed Defendant's instructions.  The Fourth Amendment does not prevent unreasonable searches by private citizens.  The Fourth Amendment only prohibits unreasonable searches and seizures that amount to Government action; "it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." United States v. Meister, 596 F. App'x 790, 792-93 (11th Cir. 2015) (citing United States v. Jacobsen, 466 U.S. 109, 113 (1984)); see also United States v. Sparks, 806 F.3d 1323, 1334 (11th Cir. 2015).  When determining whether a private person is an agent of the government, two factors are examined: (1) "whether the government knew of and acquiesced in the intrusive conduct"; and (2) "whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003).  Here, there is no evidence that the FBI Special Agents had any communication with Cooley and Cousins prior to the discovery on Defendant's computer, and thus, they did not encourage the search or seizure of the computers or play any part in it.  (Tr. 13-14, 25-30, 49).  Cooley and Cousins credibly testified that they turned over the computers to the FBI on their own initiative for their own purpose because they were afraid that they could be vulnerable to prosecution for their continued possession of the computers in the residence.  (Tr. 10, 12-13, 15, 17, 20, 23, 28-31, 35, 52, 54-55); see also United States v. Smythe, 84 F.3d 1240, 1243 (10th Cir. 1996) (explaining that "Fourth Amendment concerns simply are not implicated when a private

20

person voluntarily turns over property belonging to another [where] the government's direct or indirect participation is nonexistent or minor"); United States v. Ford, 765 F.2d 1088, (11th Cir. 1985) (concluding that where defendant lived with his brother and his brother's family and defendant kept his room locked, but brother broke into defendant's bedroom, found cocaine there, and then notified the DEA, brother's search did not offend the Fourth Amendment because brother did not act as agent or instrument of the government when he searched the bedroom).

Furthermore, based on the parties' arguments, it appears that the FBI Special Agents obtained a search warrant before they searched the contents of the computers. Although the affidavit supporting the search warrant application has not been provided to the Court, Defendant's arguments that the affidavit is unsupported by probable cause do not appear to have merit. Although Defendant argued the affidavit included no indicia of Cousin's reliability, Cousins was an eye witness as to the illicit contents on Defendant's computer and there is no known motivation for him to lie about what he found. The Court is also skeptical of Defendant's argument that the expert testimony in the affidavit that collectors of child pornography will maintain their collections on multiple devices was undercut in his case because there was no pornography on the devices seized during his arrest. Even if it is assumed that no illicit materials were found on computers Defendant traveled with, it does not support the inference that no such materials would be found on Defendant's other computers. Logically, Defendant might not want to have contraband on a computer while traveling because travel often

involves the presence of other people and thus, raises the risk of discovery by others or even law enforcement.  It is a logical inference that Defendant might not be so careful with computers that were stored in a closet in his home, especially given that contraband had already been found on one computer stored in the living room of his home.  (Tr. 22).

Furthermore, Defendant's new argument regarding the timeliness of the execution of the search warrant is untimely and will not be considered by this Court.  Motions to Suppress must be brought prior to trial, if the basis for the motion is then reasonably available.  Fed. R. Crim. P. 12(b)(3)(c).  The Court may set deadlines for parties to make pretrial motions, but if the Court does not do so, the deadline is the start of trial.  Fed. R. Crim. P. 12(c)(1).  If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely, but the Court may consider the defense if the party shows good cause.  United States v. Brandon, 636 F. App'x 542, 547 (11th Cir. 2016); Fed. R. Crim. P. 12(c)(3).  "Failure or inadvertence of counsel to timely file a motion to suppress does not constitute good cause."  Brandon, 636 F. App'x at 547.

Here, Defendant was given through and including August 19, 2015, to file pretrial motions such as motions to suppress.  (Doc. 27).  Although Defendant filed a Motion to Suppress Evidence one day after the stated deadline on August 20, 2015, Defendant's Motion did not include the grounds now presented in his post-hearing brief.  Defendant did not raise these grounds until he filed his post-hearing brief on June 21, 2016, ten months after the deadline for filing such motions and four months after the Court held the hearing on the Motion to Suppress.  Because these grounds for suppression had not

22

been raised, no record pertaining to the issue was created during the February 2016 evidentiary hearing on the motion to suppress. Additionally, Defendant never submitted documents relevant to the Motion, such as copy of the Search Warrant. Although the Government raised the issue of timeliness of Defendant's Motion in its post-hearing brief, Defendant never filed a reply or otherwise responded to the timeliness arguments. Thus, Defendant does not present good cause for his failure to raise this argument by the deadline for pretrial motions or even by the February 2016 evidentiary hearing. Accordingly, Defendant's Motion to Suppress should be **DENIED** as to the issue relating to timeliness of execution of the search warrant.

## MOTION FOR RETURN OF SEIZED PROPERTY

In Defendant's Motion for Return of Seized Property, Defendant requests that the government return items law enforcement officers seized from him in connection with his arrest on May 2, 2015. (Doc. 18). Specifically, Defendant seeks the return of his ATM banking card, currency, and keys for his home and his vehicle, so that he may make proper provisions for his possessions in California. Defendant contends that these items should be returned because they are not contraband, are not subject to forfeiture, and will not be used in the presentation of the pending charges against him. The Government indicated in response that it seized $623.06 in cash, a number of credit cards, and nine keys, that these items are not contraband, and that the case agent will contact Defendant's counsel to arrange for the return of these items. (Doc. 100, at 2-3).

23

In Reply, Defendant stated that he does not have any objection to the Government's response.  Accordingly, because the Government has made provision for the return of the aforementioned items, and Defendant has indicated that it has no further objection, Defendant's Motion for Return of Seized Property is **DEEMED MOOT**.  (Doc. 18).

## CONCLUSION

Based on the foregoing reasons, Defendant's Motions to Dismiss the Indictment and Motions to Suppress should be **DENIED**.  (Docs. 30, 41, 73, 76).  Defendant's Motion for Return of Seized Property is **DEEMED MOOT**.  (Doc. 18).  As there are no further motions pending, the undersigned certifies this case ready for trial.  The Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED AND REPORTED AND RECOMMENDED** this __6__ day of March, 2018.

/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

24